May it please the Court, my name is John Ellison. I represent ABM Industries and AMCO System Parking. I'll refer to them interchangeably as ABM or AMCO. I don't think there's much difference for purposes of the issues before Your Honor, Your Honors. This appeal involves a review of the District Court's ruling that there was no coverage for an underlying Texas litigation where my client, ABM AMCO, was sued for harm caused by an allegedly false document that it prepared and circulated to third parties. Was the document false in the sense of telling a lie or was it simply misstating a legal position? I think the allegations made by the plaintiffs, I think, cover both of those aspects. I think they allege that it was false, that it was either intentionally made false or that it was at least a negligent transmission of an inaccurate statement. But I'm after a different question. What do you mean by false? Something can be false in the sense that you say black is white. This is a factual falsehood. Or it could be false in the sense that it's in Roney's legal argument. I think the position that was communicated by AMCO was a statement of fact of its view of how the lease was to operate and that, in fact, it had been charged improperly, rents, etc. I don't want to put words in your mouth that you disagree with, but it sounds as though it's an inaccurate statement of law. That is to say, the lease, according to your client, in terms of that letter, the lease was no longer operative. I think, Your Honor, what the plaintiffs alleged, and I think that's what, at least for the duty to defend analysis, governs, is that my client did not review certain factual information that was submitted to it and, as a result, communicated inaccurate factually-based statements to both Whitney Bank and another potential lender, Aladdin. You keep calling them factual statements, but I'm having a hard time differentiating between the question that Judge Fletcher was getting at. Is this an argument or a fact? It seems to me that what this was was a legal position, that ABM was essentially advancing, and you call it a fact of an argument, but that, to me, just confuses the issue. It's a statement of what our position is with regard to our rights and responsibilities under the lease. That's not a fact. It's just an argument. Well, Your Honor, I think in the way the circumstances led to the communication need to be looked at in the context of what was asserted in the underlying petition in Texas, and that was that our client had knowledge of certain facts, which it either deliberately ignored or mistakenly ignored, and, as a result of its inaccurate factual knowledge, made inaccurate factual statements because the factual premise on which its representations to the bank in the tenant estoppel certificate were made were incorrect as a factual matter. What facts are you talking about then? The facts of, if you look in the underlying petition, and I think that's in the record at page 204 through 209, there are statements that our client didn't acknowledge or was not aware of, the existence of an anti-merger clause in the original document. You're telling me the fact is that there was an anti-merger clause and the erroneous factual statement by your client was what? Was that it either ignored that that exists or they didn't bother to check that it exists, so they made an inaccurate factual statement that the two... They made an inaccurate factual statement that there is no anti-merger clause? No. In effect, they did by saying that there was a merger as a result of the acquisition of the property. So, in essence, they're making a legal argument that that anti-merger clause never became effective, that it didn't apply given the way the facts had played out. That could be one end result, or the end result could be that they ignored the fact or didn't bother to check the fact that there was an anti-merger clause in the underlying document, and I believe that that is specifically alleged. Are we going to... Are you asking us to now create a rule that every time parties take adverse positions on legal points, in this case the meaning of a clause in a contract, that they or their clients can now be sued for making negligent or intentional misrepresentations in the context of asserting a legal position? Because that's the logical result of your argument. Well, Your Honor, I think that goes to the underlying litigation in Texas. What we're concerned about, I think, is whether if an allegation or an action like that is brought against an insured, does the insured then have the right to turn to its insurance company and say, these allegations have been made against me, they potentially involve defamatory or disparaging remarks towards the party who's suing me, and does my policy entitle me to a defense of that claim? Let's talk about the disparagement. As I understand it, under Texas law, the disparagement has to be as to the goods or services of the client. Is that correct? Products, goods, or services. Products, goods, or services. So how does taking a legal position with regard to the meaning of a term in a contract liable or slander the client in its products, goods, or services? Well, I think you have to step back and look at what is the entity that the remarks are made about, and how does the remark relate to its business? And in this instance, we have a single-purpose entity that exists only for the purpose of owning and operating and managing this parcel of real estate that is turned into a parking facility. So my client's alleged remarks about that facility go to the only good, the only service, the only product that entity holds, which is the parcel of real estate that it rents out to Amco. But what you're really arguing is sort of a tortious interference in contractual relations, are you not? You're basically saying my client had an expectation that it could get financing from the bank and this other backup source if that failed, and that as a result of the wrongful action, the financing was frustrated. But I don't see that as a liable or a slander on products, goods, or services. Well, the disparagement, I mean, the basis for the tort of interference was the communication, we think of inaccurate factual information, that caused the lenders not to want to do business because the net result of the communication from our client to the lenders was that they essentially devalued the only asset, the only product, the only good, the only service that that entity held, which was the property and the lease. And when the lender underwrote the risk, I shouldn't use that term, when the lender evaluated the risk, one of the things that it evaluated was a source of income from the lease, correct? Correct. So if there was a question as to whether or not under the contract the lease clause was enforceable, I would think a prudent lender would be concerned that if a source of income was no longer going to be coming to your client, that it might imperil the client's ability to repay the loan. I think that's exactly right, and I think that's why the statement is disparaging towards the entity, because it devalues. Call it disparaging, but I'm not sure that's disparagement. It may very well be frustration of the investment opportunity because of the fact that the lender had a legitimate concern, but I don't see that as a libel or slander on the product, good, or service that your client otherwise provides. I think, Your Honor, the law says that disparagement or injurious falsehood or trade libel amounts to a negative comment on the product, good, or service, or the ability of the entity that holds it to use that in a positive, constructive manner. And I think a fair reading of the allegations made against AMCO by IAHJFK is that ABM's communication of the tenant estoppel certificate impugned the value of the asset, the sole asset that that entity held, the sole product it had, which was the parking facility and the associated lease, and as a result of false and allegedly false communication about that, they could not engage in a commercial transaction and obtain the financing that they had requested. What if instead of saying we owe nothing under the lease, your client had said in this letter, well, there is this lease out there. We've been paying under it for three years after the purchase of the underlying fee estate, which I think is about how long they were paying, without objection. Right. They had said, but, you know, in reconsidering the legal position, we think we just aren't going to pay that anymore, and you should take that into account as you're trying to figure out what this property is worth. Would you be making the same argument? I don't think I would, because that, I think, is a statement of a legal position, as opposed to saying this lease, as a factual matter, doesn't obligate us to do anything or didn't obligate us to pay the rent that we had been charged over the last few years and on a going forward basis doesn't obligate us to pay the rent. To get down to brass tacks on this, when it looks to me as what we've got here, is that your client saw a vulnerability. They wanted the financing. They wanted to buy it. They reversed the position they've taken for three years. I mean, they've been paying rent without interruption, without objection, ever since the three years ago purchase of the fee estate. All of a sudden, we've got financing that they can foul up by refusing to acknowledge that they owe the money, and they say, listen, we're not going to give you a proper letter unless you pay us a million and a half dollars. I mean, that's, in effect, what was going on. That was one of the allegations that was made, certainly. Was it true? I don't know. The answer is I don't know, and it was never finally resolved in the underlying case. You don't know that the client sought an advantage as a result of the situation? It's painfully apparent to anybody who reads the records. I think that's true. But to go as far as that, certainly there were discussions about taking commercial advantage of the situation. There's nothing proper about that. Parties do it all the time. Except it cost you a little over $6 million in settlement as a result of what you did. Right. But I think, Your Honors, what we need to do for purpose of the analysis in this appeal is go back and look at the underlying claims as pled in the petition filed by the IAHJFK plaintiffs and measure that against the scope of coverage provided by the policy. And California law has been consistent in adopting a broad and sympathetic view of allegations for purposes of determining a duty to defend. And if it is a close case, if there is any potential that those claims could amount to a disparagement or a trade libel or an injurious falsehood claim, then for purposes of the defense, the insurer is on the hook. And that is a wholly separate inquiry from whether or not they ultimately have to pay for the settlement because then it would normally be our obligation to prove that the claim actually fell within the scope of the coverage. All we're doing now is, is there a potential under these faxes pled that this may amount to a claim that is one of a disparaging nature by the actions of my client against the underlying plaintiff. And we think if you go through the allegations in the petition, there are clear claims that we either knew or should have known, classic types of claims that would fall within a factual type of failure on our client's part to understand all of the aspects of what it was communicating to the other side before it did so. And as a result, it communicated allegedly false information to a third party that could be actionable as trade libel, as commercial disparagement, as an injurious falsehood under Texas law. And it may not qualify as one which they necessarily knew was false as the allegations are pled, but may have just been something that they didn't bother to check and did so recklessly or negligently. And if that's the case, then our client was entitled to a defense to the underlying claim. The next issue, I think, before your honors, is if that is the case, then what is the consequence to National Union for not honoring its duty to defend? And under the Isaacson case and the Earth Elements case, under California law, the rule is clear that if an insurer breaches its duty to defend, then it must, then it then allows the policyholder to go forward and attempt to reasonably compromise and settle the dispute. And in that vein, we think that the judge's opinion below was incorrect because she, by virtue of having made a mistaken ruling on the duty to defend analysis, we would submit that that translated then into an error, a reversible error on the indemnity analysis. Because if the duty to defend was breached by National Union, then it was our client's right to proceed to settle the case in a reasonable fashion. And then the only challenge National Union would be entitled to take to that action would be whether the settlement was reasonable or not, based on the facts that existed at the time of the resolution. So, Your Honor, I think in order to save some time for rebuttal, I would just like to close by saying, we think taking a broad reading of the allegations as pled in the underlying petition, and that's in particular paragraphs 21 and 22, 28, 31, 34, and 37, that you can read those to say that our client communicated false information, either deliberately or negligently, to the bank and to Aladdin, the second potential lender. That that could amount to commercial disparagement or trade libel or injurious falsehood under Texas state law. It certainly raised the possibility that that could be an actual claim. That triggered the duty to defend, which National Union did not honor. And as a result, our client was entitled to reasonably settle the underlying case. And the issue we would submit on remand is a question of whether the settlement was reasonable, and that is typically a factual question, but certainly one that is not developed on this record. I have a question for you. Sure. Are you claiming that the insurance policy covered negligence? Certainly, within the scope of the personal injury coverage, there's been an issue raised about knowledge of falsity, exclusion. And I think while there certainly were aspects of the underlying petition that pled there was knowledge when these communications were made, there are also aspects of the petition that pled that they were negligently or recklessly made. And if that's the case, then the knowledge of falsity exclusion doesn't come into play, at least for purposes of the defense issue separate from the indemnity question. And the other thing, and I'll just leave it at that. Okay. You've got about two and a half minutes. Right. Thank you. May it please the Court, counsel. I want to make two main points in my presentation here today, and I will ---- Could you please state your name for the record? Yes, Your Honor. I apologize. It's all right. I'm Wade Crosno for the Appalachian National Union Fire Insurance Company. Thank you. I want to make two points in my limited time, and I'm going to first summarize those for the Court, and then we'll try to address them in more detail as time permits. The first point here is that the test for determining insurance coverage is not whether ABM can imagine some set of facts that would invoke the coverage of our policy if they only existed or had been pleaded by the underlying plaintiff. That is not the test. If you look at the complaint here, in the underlying lawsuit, it did not assert a claim for libel, slander, or disparagement of goods, products, or services. It simply did not. Nor did the complaint allege any facts or seek any damages, suggesting that despite what it said, the underlying plaintiff was really complaining about libel or slander or disparagement. The allegation that ABM relies on, which is the false statement about a contractual lease, simply is not disparagement of a good, product, or service. Similarly, an erroneous legal opinion about the lease is not libel, is not libelous, because it is not a statement of fact. It's a classic legal opinion. And in any event, it was not alleged to have, the underlying plaintiff did not allege that it injured its reputation. A false statement, standing alone, does not a libel make. And that's particularly true when the false statement is, again, a classic legal opinion that I think there was a merger, where ABM said we think there was a merger here of the leasehold and the fee estates. In short, ABM cannot invoke the coverage of national union's policy by attempting to rewrite the underlying complaint, or by making coy references to unspecified extrinsic facts that supposedly trigger coverage. Now, the second point I want to make, and I'm not going to dwell on this here, is that even if the claims against national union were covered under the policy, which they were not, national union would not have a duty to defend under its excess umbrella policy. That policy imposes a duty to defend in only two limited circumstances, when the limits of all underlying insurance are exhausted or when the claims are covered by the umbrella policy, but not any of the underlying policies. And neither condition has occurred here. Well, Zurich was the primary. Yes. They settled out. Yes. I assume we can conclude from the record that the primary limit was at $2 million on the Zurich policy, and that your client was the excess for $25 million? Yes. So to the extent that the plaintiffs are claiming that there was a breach here, if we were to conclude that $6 million and change was a reasonable settlement and a breach had occurred, wouldn't both the primary and the excess carrier be on the hook for the defense cost? No, Your Honor. There's no evidence in this record that Zurich paid its underlying policy limits. And you also have to look at the timing of when Zurich settled. We don't know what Zurich settled for in this record. And we also know that Zurich did not participate in the settlement of the underlying lawsuit. ABM made that payment. Zurich, several months later in the context of the coverage litigation, settled directly with ABM. So because of the timing of that, Zurich would have, to the extent it had a duty to defend, it would have continued throughout the underlying litigation. And national unions, any duty that national union could have had under the policy, assuming that Zurich's policy had been exhausted, it wouldn't have taken effect until after the underlying suit had already settled. So there wouldn't the duty to defend under our policy never would have been triggered. So is this argument a really technical one in the sense that because we don't know what the circumstances are with regard to the primary insurance coverage, we can't possibly hold the excess carrier liable? I don't think it is a technical argument. It's an argument about the conditions that are necessary. You want us to conclude it's a really good argument. But I didn't understand from your brief that you were making this argument, so maybe you can help me. And it is. No, what we've said all along in our briefing is that there are two conditions that have to happen before one of two things would have to happen before we would ever have a duty to defend, and neither of those things happened. We don't have exhaustion of the underlying policy. We don't have any proof that it was exhausted, and we don't have any proof it was exhausted before the conclusion of the underlying lawsuit. And in absent proof of that, Zurich would have had the duty to defend through the conclusion of that lawsuit. Now I think I understand why Zurich was so anxious to get its name off the pleadings here. So what do we do in that case? Would we have to conclude that summary judgment was improperly entered and therefore send it back, because we've got undeveloped facts on the record here in order to address all those issues? No, it was their burden to show that there was exhaustion of the underlying policy. And the court only would get to that issue if there is some sort of coverage under our policy in the first place. Let me ask you this. I'm trying to formulate the other side's argument in the strongest way for them that I can. They appear to be arguing that they had a property worth X. They were trying to get financing to purchase the property worth X. And what they did was to write a letter that made it quite clear to the lender that the property wasn't worth X, but rather was worth X minus Y, the Y being the value of the lease payments for the right to go across the budget property. So what they did was, by their statement, they made it clear that the property was worth less than the property was actually worth. Why is that not disparagement of value? Well, because it has to be disparagement of a good product or service. A piece of real property is not a good? No. Why not? Well, there's no case that has been cited by the other side that says that it is. I assume a piece of personal property is a good? If I'm selling you soap, that's a good? That would be a product. And if I'm selling you a new condo that I just built, is that a good? I don't believe it is, Your Honor. Why not? It's a piece of real property, and that does not follow. And your definition of good does not in any circumstance include real property? No, it does not. And do you have any source for that? The district court's opinion cited two common dictionary definitions in her opinion and discussed that a lease and a piece of property are not goods, products, or services within the meaning of those definitions, and that's what we would be relying on here. The policy when it ---- Well, you see, the disparagement, as I've couched the argument, is not as to the lease. The disparagement is to say that the property itself, the entire property that they're setting up the financing for, is not worth X. It's rather worth X minus Y, and the allegation of the complaint is that that Y, that is to say the diminution in value that shows up as a consequence of their letter, well, that's the disparagement. So it's not that the lease is the property. It's the overall property that's the property. The allegation of the complaint and the statement in the tenant estoppel certificate were directed at the lease itself and didn't talk about it. Because the obligation to pay under the lease is what diminishes the value of the property. Well, did you say that again? The obligation to pay under the lease or the non-obligation to pay under the lease is what affects the value of the property. That's to say the overall property for which the financing is sought. Right. Well, it still is not an allegation about a good product or service. I just think if you look at the dictionary definition, it's not directed, the commonly used definitions here are not directed, do not apply, a good product or service, excuse me, real property is not going to fall within that definition of good product or service. It may be that the commercial code sheds some light on what is a good product or service. The commercial code, I understand, is not a good product or service under the UCC. It's possible, but I also think if you look at this policy, and I'm trying to think of an example right now, there are references in this, in the underlying Zurich policy, and perhaps in the umbrella policy to property being and which is, which then suggests that that is separate from the use of good products or services as it's used in this particular coverage part. Yes. It's a slightly different hypothetical, and I hope in suggesting it that it doesn't unduly confuse the argument. But suppose that the dispute was not over the term of a lease, but actually over an easement in order to reach the property, which would render ABM's 26 acres unusable because it would be an island that could not be reached if an appropriate easement couldn't be obtained for the driveway to get to it. Would that make a difference? I don't think so. But if you tie it back in to the underlying requirement of disparagement of a good product or service, and if you do that, then I don't think an easement is going to qualify for that. It's a right to enter on land. But to accept Mr. Ellison's position, if ABM is in the business of running airport parking garages and the 26 acres was going to be one of these facilities that multiple car rental companies use to rent cars and you couldn't get to it, wouldn't that be a disparagement of ABM's services or the product that it was offering to its customers? That was not the way that it was alleged. I mean, they're trying to take the reference to the merger of the lease and say it could be all these other things, but that was never alleged. It was never called a libel or slander or disparagement. And then there isn't that additional allegation that they're wanting to be in there to trigger coverage. It simply isn't in there. Assuming that it was a slander of title, would that have been covered under the policy, in your opinion? Well, it could be. You have to look at the underlying factual allegations here. I think the rule is, and there's general agreement on this, that you don't, although it certainly is significant when you look to the labels put on causes of action, that certainly gives you a clue as to what the underlying plaintiff is really trying to allege, that it's not dispositive, and you do have to look to the underlying factual allegations. And if you look here, for instance, on the libel claim, there is not an underlying factual allegation about injury to reputation, which ABM agrees would be required under Texas law. So that particular point is missing. Isn't the reputation, though, the value of the lease? And now you're saying you have no value whatsoever. I've never seen, and I don't think they've offered you any case law that says that damage to reputation can be measured by the economic value of property, the lost value of it or lost income from it. I think they're trying to merge elements of disparagement and libel, and that they can't do that. They're separate coverages under the policy. For disparagement, you have to have a good product or service. For libel, under any definition, you have to have injury to reputation. And it also, if you look at this, this is simply not a statement that a corporation would normally think of as injurious to its reputation and think, oh, we've got to call the lawyers, because we've been libeled here. It wasn't a statement that they were a tax evader or some sort of corporate polluter, that they were operating sweatshops over in India or someplace like that, and something that damaged their corporate reputation. That part of it is simply missing here. So what we have here is a situation where the other point I should make, and I don't think this is really in dispute, is that there is no slander here. There is no allegation that they've identified that would be a false oral statement. The only thing that ABM is pointing to is the written statement in the tenant estoppel certificate. So it either has to be disparagement, which it's not because of the absence of a good product or service, or it has to be libel, and it's not libel because there's no injury to reputation. It's a legal opinion, and that should be the end of the story on that. Now, their fallback position here has really been to allege all along that, well, maybe if the facts in the complaint don't get us there, you have to look at the insurer as an obligation to consider extrinsic facts that are known to it. And that's true, but they have never identified what those facts are, where they are in the record, and how they trigger coverage. They've just made references to facts that are out there without identifying what they are. And as the district court held, that is not sufficient. I do also want to make a point about we have a knowledge of falsity exclusion in our policy. And so even if you hit a situation where you thought there was a covered libel or slander or disparagement claim, this exclusion would still apply. There are allegations here that they knew about this anti-merger provision, or the anti-merger clause, that ABM knew about that and went ahead and made their merger claim anyway. And the complaint also alleged that this was done as part of a scheme to extort money. And those are the kind of allegations that bring you within the knowledge of falsity exclusion. Does the complaint also allege should have known? Did they also, I don't know actual knowledge, but should have known? Your Honor, I'm searching back through my memory, and it's possible that that's in there. And if that's so, that means that your exclusion for knowing may or may not apply. Well, if that is in there, that would raise that possibility based on the complaint allegations. But we also have provided the Court with e-mails that are from ABM that are part of the record here. If you look at page 422 of ABM's record excerpts, where it indicates that the people at ABM knew about this anti-merger provision, and nonetheless went ahead. And for purposes of duty to defend, how deep do we go? That is to say, do we look at the underlying discovery that starts to show up as the case is being litigated, or do we just look at the complaint? Well, I think you can. The extrinsic fact rule can go either way. But I really believe what we're talking about here is the duty to indemnify. And that comes back to the fact that we are an umbrella insurer. Why do you say we're coming back to duty to indemnify? You also have a duty to defend. As an umbrella insurer, we only have the duty to defend if the underlying primary policy issued by Zurich was ever exhausted. And there's no proof. How does that actually work? And this may or may not be relevant to how I think I'm going to end up thinking about the case myself. Let's say that there's a suit in which $10 million is sought. The primary insurer insures for $2 million. You're the excess insurer for an amount that goes up to $25 million or whatever. So it's clearly within the range that you're done. Does that mean you have no duty to defend at all, so long as the primary insurer is in the case? You don't need to pay any part of the defense? That's right, Your Honor. That's what the policy says, and that's what this court said in the, I believe it's the IOLAB court case that's cited in our brief. It's also what the Calif. It's a self-cannibalizing primary policy that burns through the $2 million in the first ten months of the case. Well, we don't have that here, but I believe that would be the rule as far as I know. I haven't researched that specific issue, but I think that is still the rule. At no point prior to the resolution of the underlying litigation would the primary insurance carrier ever turn to its supplemental coverage carrier and say we've used up all of the limits of our policy, it's your risk now. If the primary carrier pays its limits, then we would be required to step in and defend. You would have a duty to defend at that point. If the primary carrier pays its limits prior to the conclusion of the underlying lawsuit. And here you don't have proof that that ever happened. And Zurich's settlement, whatever that payment was, to ABM did not occur until about six months after ABM settled the underlying lawsuit. Another way you could have coverage under our policy for the duty to defend is if you were in a strange situation where the underlying policy provided no coverage and our umbrella policy provided some sort of supplemental or additional coverage that was not. And that could happen, but ABM has not identified any claim under our policy that would be covered under our policy that would not also have been covered under Zurich's policy. Okay. That will be used up your time unless there are further questions on the bench. We thank you. And Mr. Ellison, you saved about two and a half minutes. Very quickly, I'll pick up with the last point about how the policies operate with one another. The national union policy provides that a duty to defend exists if damages are sought for personal injury that is covered by the policy, but not covered by the underlying policy. The allegations in the underlying petition allege damages here of at least 15 million as much as 26 million. Under the national union versus Seagate technologies decision cited in our papers, under the exact same policy language that we have here, the court said that when there are allegations of damages that could never be covered by the primary, i.e. in excess of 2 million here, then that raises the potential of coverage under the umbrella policy. And if there is a potential for coverage, they have a duty to defend in addition to the primary policy. It's a joint obligation. And incidentally, that Seagate technologies case also involved an underlying disparagement claim where national union was held to have a duty to defend, like we believe ABM was entitled to here. Just to go back quickly to where we started, I'd ask your honors to take a look at the Jay Lamb case out of the California Court of Appeals, which is a decision about commercial disparagement and the duty to defend under California law. And the court there found a duty to defend in a case where the allegations in the underlying litigation involved a claim that a patent was invalid. And we would submit to your honors that the claim that a patent is invalid is a statement of fact just like a claim that a lease doesn't obligate us to pay these rents. Let me ask you this. How do you respond to his argument that a bar of soap is a good, but a one-off piece of real estate is not? That is to say, I'll elaborate on the argument he didn't quite make. This is not a condo developer that is selling off condos as part of its business. This is a one-off real estate transaction. How do you respond to his saying, but a one-off real estate transaction, that real estate is not a good? I was going to come back to that, your honor, because that was your question. Amco Parking Systems only, this is its only business. It leases facilities and operates parking facilities at airports around the country. What he's essentially saying is that the policy they sold, if you accept their position, is that they have no coverage for the business in which they're engaged. That's not the argument at all. Your argument is that you have disparaged the good owned by the owner of the real estate. Not that disparage what you operate, you've disparaged this piece of real estate. Why is that piece of real estate that you have allegedly disparaged a good within the meaning of the policy? We have cited Texas cases that talk about operations of real estate and operation, managing of real estate and leasing of parcels as a service or good for the enterprise that owns and engages in that type of commerce. That's exactly the business that IAHJFK does. It owns one asset, it manages it, it leases it, that's its product, that's its service. And the point I was trying to make before, just a quick circle back, your honor, is that Amco Parking Facilities engages in that type of transaction in every type of relationship it has in its business. So that if the national union policy can never get involved in that type of dynamic, because that's not a good, a product or service, then Amco Parking Systems is essentially being deprived of insurance for most of its operations. You're over time, and unless there's some further question from the bench, thank both of you for your useful argument in this case. Thank you, your honors, and thanks again for accommodating me. I appreciate it. Enjoy your family reunion. Thank you, I will. I actually do enjoy my family, so I wasn't just kidding.
judges: Fletcher, Tallman, Dawson